**SIEBE, Admr., et al.**

v.

**UNIVERSITY OF CINCINNATI.**

Court of Claims of Ohio.

No. 96–05467.

Decided Oct. 29, 2001.

See also, 117 Misc.2d 44, 1999-Ohio-995, 766 N.E.2d 1070.

Charles G. Atkins, for plaintiffs.

Anthony J. Celebrezze, Jr. and Marilena R. Walters, Special Counsel, for the defendant.

FRED J. SHOEMAKER, Judge.

{¶1} This case was tried to the court on the sole issue of liability. Plaintiff Daniel Siebe ("Daniel") asserts claims for both personal injury to and wrongful death of Donna Siebe ("Donna"), and for negligent infliction of emotional distress on his own behalf. Plaintiff Charles Smithers ("Smithers") asserts claims of personal injury, lack of informed consent, and negligent infliction of emotional distress. Defendant, University of Cincinnati, denies liability.

{¶2} In October 1994, Donna developed end-stage renal failure, necessitating a kidney transplant. Smithers, Donna's brother, was found to be a suitable kidney donor. On June 7, 1995, Donna, her husband Daniel, and Smithers arrived at defendant's University Hospital in preparation for the surgeries that were to take place on June 8, 1995. Donna was thirty years old, four feet, nine inches in height, and her normal weight was eighty to eighty-five pounds. Before her admission to surgery, she weighed approximately seventy-six pounds.

{¶3} On the morning of June 8, 1995, final preparations were made for the two surgeries. The first surgery was to remove Smithers's left kidney, and the second surgery was to transplant that kidney into Donna. With respect to

Donna's surgery, Dr. Janet Torpy, the attending anesthesiologist, was scheduled to insert a central venous line ("CVL") into Donna's right jugular vein. At the time of the surgery, Dr. Torpy was called away to an emergency and left the operating room. Dr. Dirk Younker, a staff anesthesiologist, began preparations for insertion of the CVL but he too was called to an emergency. Dr. Elizabeth Burgess, another staff anesthesiologist, was also called to an emergency.[1] However, Dr. Burgess asked Dr. Lynda Groh, an anesthesia resident, to help make sure that the CVL was properly placed. When Dr. Groh entered the operating room, she was told to assist Lennda Hungerford, a trainee nurse anesthetist. Ultimately, Hungerford inserted the CVL in the presence of Dr. Groh. Hungerford testified that she had never placed a CVL before June 8, 1995.

{¶4} Moreover, Hungerford testified that she did not have any formal training regarding the placement of a CVL. Virginia Grootegoed, Hungerford's certified registered nurse anesthetist instructor, told Hungerford on the morning of Donna's surgery that she would be involved in the placement of the CVL. Since Hungerford had no experience or training, she reviewed an anesthesia book that morning in an attempt to understand the procedure for placing a CVL.

{¶5} The CVL has two ports. During surgery, the CVL was used to infuse Dopamine in one port and to monitor central venous pressure in the other port. Additionally, fluids were administered through a peripheral IV (intravenous) line. After surgery, fluids were infused through the CVL and peripheral IV lines.

{¶6} At 3:27 p.m., Donna's surgery was concluded. The transplant was successful, and Donna was sent to the post-anesthesia care unit ("PACU") in stable condition for observation and care. At 3:30 p.m., a chest x-ray was taken to confirm the position of the CVL, which is standard procedure. Dr. Frans Rahausen, the surgery fellow who assisted Dr. Wesley Alexander in transplanting the kidney into Donna, reviewed the x-ray and requested that the anesthesia department be called to pull back the line because it appeared that the CVL was in too far.

{¶7} At 4:00 p.m., Nurse Teresa Kelley told Dr. Eleanor Canos, the on-call staff anesthesiologist, that Dr. Rahausen had requested that the CVL catheter be pulled back. Dr. Canos asked Kelley whether Donna was stable. Upon hearing that Donna was stable, Dr. Canos glanced at the x-ray but did not look at it closely to determine the position of the catheter. Dr. Canos told Kelley that she had to attend to a patient in the operating room and would return later to adjust the line. However, Dr. Canos never returned. Kelley testified that pulling back or adjusting the CVL is not a nursing function, and that it would not have been proper protocol for her to have adjusted it.

---

1. The court notes that none of the doctors testified as to the specific details of the emergencies.

{¶8} Beginning at 5:00 p.m., Donna was given fluids through the CVL in accordance with her doctors' orders. During the next hour, her blood pressure dropped from 134/86 to 124/86, and her heart rate increased from 80 to 95 beats per minute ("bpm"). At 6:00 p.m., when she received more replacement fluid through the CVL, her blood pressure dropped further, and her heart rate increased to the point that she was tachycardic, from 95 to 117 bpm. From 7:00 to 8:00 p.m., her blood pressure dropped to 100/80 and her heart rate rose to 135 bpm.

{¶9} The medical records reflect that after surgery, Donna complained of severe back pain. Daniel testified that from 3:30 to 8:00 p.m., he was permitted to see Donna for three short periods of time. During those visits, Donna complained of severe pain in her back, neck, and right chest. Donna was in and out of consciousness after her surgery.

{¶10} At 8:00 p.m., Donna remained tachycardic with a heart rate of 118 bpm and her blood pressure dropped to 104/80. During the period from 4:00 to 8:00 p.m., Donna lost 3,425 cc (3.4 liters) of body fluid through urination. There was also a peripheral IV line in her arm, through which she received only 650 cc of replacement fluid between 7:00 and 8:00 p.m. At 8:15 p.m., Donna's blood pressure fell to 65/44, and at approximately 8:30 p.m., her blood pressure fell further to 66/40. By 8:45 p.m., her blood pressure had dropped to 60/40 and her heart rate was 124 bpm. At that time, a "code" was called and CPR was initiated.

{¶11} From the time that Donna was in the operating room and in the PACU, until the time that the code was called, her oxygen saturation level was always above ninety percent.

{¶12} At 9:06 p.m., a second chest x-ray was taken. At 9:18 p.m., Donna's left chest was surgically opened in order to permit direct cardiac massage. Upon opening the left chest, Dr. Rahausen found a somewhat empty heart. Donna did not respond to the direct cardiac massage. The second x-ray was viewed at approximately 9:30 p.m. According to Dr. John Valente, a second-year transplant fellow, it showed that the right side of the chest was opaque and that the central line looked "a little bit high and lateral." Donna's right chest was then opened and a large amount of blood-tinged fluid poured out. Dr. Rahausen reached into Donna's right chest cavity and felt the CVL penetrating through the top right side of that area. Donna was pronounced dead at 9:39 p.m.

{¶13} Although Daniel requested an autopsy by the Hamilton County Coroner, none was performed. Medical records confirm that the coroner was notified and that Donna's body was to be delivered to the morgue. However, the delivery date and time were not noted in the records, nor was the identity of the person who allegedly delivered Donna's body to the morgue. Defendant asserted at trial

that the coroner has discretion to reject cases. However, there is no evidence that the coroner refused to perform an autopsy on Donna. The greater weight of the evidence leads this court to conclude that Donna's body was never delivered to the morgue.

{¶14} On the day of the funeral, Daniel discovered that no autopsy had been performed. Consequently, the internment was postponed. Donna's body was then transported to Louisville, Kentucky, to the office of the chief medical examiner. A forensic postmortem was performed by Dr. Tracy Handy, the chief medical examiner.

{¶15} At this juncture, the court notes that neither the chest x-ray taken at 3:30 p.m. nor the chest x-ray taken during CPR at approximately 9:06 p.m. was ever produced by defendant during discovery or trial. Defendant stated that the x-rays could not be located.

{¶16} Dr. Valente was present for the resuscitation efforts for Donna. He testified that Dr. Rahausen had his hand in Donna's chest after he had done the full thoracotomy and stated, "I think the IV catheter is in the chest." Dr. Valente also reviewed both x-rays after Donna had died, and stated that the catheter appeared to him as if it was in the same position in both x-rays, the only difference being that fluid appeared to be present in the right lung in the later x-ray.

{¶17} Dr. Wesley Alexander had been the director of the transplant division of surgery at University Hospital for twenty years prior to Donna's surgery. Dr. Alexander participated in Donna's transplant surgery and was called back to the hospital when Donna went into cardiac arrest. Dr. Alexander reviewed one x-ray that night in the presence of Dr. Rahausen, and thereafter concluded that the catheter was clearly misplaced. Dr. Alexander testified that he reprimanded Dr. Rahausen for not interpreting the x-ray correctly. He stated that the catheter was not too far in, but, rather, that it was not in the vessel at all. Dr. Rahausen ultimately agreed with Dr. Alexander's interpretation of the x-ray.

{¶18} The day after Donna died, Hungerford wrote a detailed account of her actions relative to the CVL installation. Many of the details in her description appear to come from a text book. Her account is significantly different from Dr. Groh's account. Dr. Groh testified that there were multiple attempts by Hungerford to place the CVL, not just one attempt as stated by Hungerford. Dr. Groh also testified that she did not watch the dilator being fed over the guidewire when the actual insertion of the CVL was attempted because she was preparing the catheter.

{¶19} Drs. Burgess and Younker and Nurse Grootegoed testified that residents in anesthesiology, such as Dr. Groh, are not permitted by the hospital or

the anesthesia department to supervise the installation of a CVL by a trainee nurse anesthetist. Grootegoed testified that Dr. Groh was not properly credentialed to supervise the installation of the CVL even though she was a resident, since only a faculty anesthesiologist is qualified to supervise the installation of a CVL. Grootegoed further stated that she herself was not even qualified to install the CVL because she lacked experience with inserting that type of line.

{¶20} Plaintiffs contend that the circumstances surrounding the placement of the CVL and the subsequent failure to verify correct placement constitute a deviation from the standard of care. Plaintiffs further contend that, in attempting to place the CVL, Hungerford lacerated Donna's right subclavian artery, penetrated the pleural membrane of her right chest cavity, and penetrated the apex of her right lung, causing bleeding of the artery and hemorrhage within the right chest cavity. Plaintiffs assert that when Hungerford attempted to confirm proper placement of the CVL, she aspirated blood from the artery instead of blood from the jugular vein. Plaintiffs further contend that as a result of the misplacement of the CVL, 2,119 cc (2.1 liters) of "replacement fluid" were infused directly into Donna's right pleural space, causing compressive force upon her right lung and heart. Moreover, plaintiffs contend that, as a result of the pressure of the replacement fluid and because the replacement fluid did not reach the circulatory system, Donna became hypovolemic (low in fluid volume) and suffered cardiac arrest, which resulted in her death. In response, defendant contends that the hydrothorax (fluid on the chest) did not cause sufficient pressure on Donna's heart and lung to cause compression, that Donna was not hypovolemic, and that she did not die as a result of the presence of accumulated fluid but, rather, as a result of pulmonary micro thrombo emboli.

### Personal Injury

{¶21} In order to prove the claim for personal injury due to defendant's alleged medical malpractice, plaintiffs must prove "that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus.

{¶22} Proximate cause is established where the negligent act " 'in a natural and continuous sequence produces a result which would not have taken

place without the act.'" *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287, 21 O.O.3d 177, 423 N.E.2d 467.

### Wrongful Death

{¶23} "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, 529 N.E.2d 449, citing *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122, 34 O.O.2d 254, 214 N.E.2d 213, paragraph one of the syllabus. In order for plaintiffs to recover for wrongful death, they must prove by a preponderance of the evidence that defendant breached its duty of care by deviating from the recognized standard of care for medical treatment.

{¶24} Testimony from three of defendant's employees established that it was the standard of care at defendant's hospital to have an attending anesthesiologist perform or supervise the installation of a CVL. It was against defendant's hospital policy to have a resident supervise the placement of a CVL by a trainee nurse anesthetist. This court is persuaded by the testimony of defendant's own employees regarding the recognized standard of care on this issue. In addition, the informed consent form that Donna signed before her surgery states the following: "5. *I consent to the administration of anesthetics and I understand that the administration of anesthetics will be under the direction of an anesthesiologist.*" (Emphasis added.) The court finds that defendant violated its own policy because the CVL was not installed under the direction of an anesthesiologist. Therefore, the court finds that defendant breached its duty of care to Donna when it allowed an anesthesia resident to supervise the installation of a CVL by a trainee nurse anesthetist.

{¶25} Regarding the misplacement of the CVL, the testimony from both plaintiffs' and defendant's witnesses establishes that the misplacement of a CVL is not a deviation from the standard of care, but rather is a recognized risk of the procedure. It is standard procedure to check the placement of the line through aspiration of blood and by examining a chest x-ray, both of which were done in this case. However, even though Hungerford testified that she aspirated venous blood during the installation of the CVL, the court is not persuaded that she had the expertise to aspirate in the proper manner or to evaluate and determine the source of the aspirated blood. The court also questions whether Dr. Groh observed the aspiration. In addition, when the chest x-ray was taken to confirm placement of the CVL, Dr. Rahausen determined that it was not in the right place. Dr. Rahausen delegated the responsibility of repositioning the line to an anesthesiologist, Dr. Canos, who was qualified to reposition the line. Neverthe-

less, Dr. Canos failed to reposition the line or to ensure that another physician followed through with that procedure.

{¶26} Dr. Alexander testified that if a physician examined an x-ray and discovered that a CVL was out of place, the physician should have the line taken out, "tap" the patient's chest to see whether there was fluid present, and then decide whether to put in a chest tube, after determining the patient's respiratory status. The failure of defendant's medical staff to follow up on the proper placement of the CVL after discovering that it was improperly placed fell below the standard of care.

## Proximate Cause

{¶27} Plaintiffs called four medical experts to testify in support of their theory regarding Donna's cause of death. Dr. Tracy Handy, the Chief Medical Examiner for the Commonwealth of Kentucky, testified that her specialty was in forensic pathology. She also stated that she was board-certified by the American Board of Pathology in both anatomic and forensic pathology and that she was an associate professor of pathology with the University of Louisville School of Medicine. She performed the autopsy of Donna.

{¶28} Dr. Handy, at her deposition, opined the following regarding Donna's cause of death:

{¶29} "It is my medical opinion that pulmonary micro thrombo emboli did not cause Ms. Siebe's death. * * * Ms. Siebe's death in my opinion was due to the misplacement of the central line resulting in the laceration of the subclavian artery, the perforation of the right upper lobe of the lung, and the infusion of fluid into the right chest space. * * * I think that the installation of the fluid into the chest space rather than into the vascular compartment where it was thought that it was going played a role for multiple reasons. For one, it wasn't in the vascular compartment where it was needed. * * * They were giving her fluid in an attempt to * * * keep her vascular volume up. Obviously if it's not going into her vascular system, that's a problem, because then she's not being hydrated in the way that they think she is. In addition to that, it's going into the chest space where it is— it can't be used by the body to keep her vascular compartment up to snuff, so to speak, and it's also filling that chest space that can interfere with the functioning of the lung as well as the return of blood through the great vessels."

{¶30} Dr. Terrance Yemen, Director of Pediatric Anesthesia at the University of Virginia, testified that he spent approximately seventy to eighty percent of his time in the active clinical practice of medicine. In giving his opinion at trial as to Donna's cause of death, he opined:

{¶31} "I believe there was an inadvertent placement of a central line catheter into the right pleural space and that fluid was infused in that catheter that created a hydrothorax that compromised and complicated the efforts to resuscitate her, such that she developed hypovolemia, the hydrothorax, the ultimate result of the cessation of substantial blood flow to the heart and then cardiac arrest and then death."

{¶32} Dr. Andrew Klein, Director of the Comprehensive Transplant Center at Johns Hopkins Medical Center, and a board-certified surgeon and professor of surgery, testified that he spent approximately sixty to seventy percent of his time in the active clinical practice of medicine. In his deposition, Dr. Klein opined as follows: "I think that she died of a cardiac arrest, which was secondary to a combination of hypovolemic shock and compromise of her blood pressure from fluid that had extravasated into her right chest."

{¶33} Further, Dr. Klein opined, in his deposition, that to a reasonable degree of medical certainty the placement of the CVL into Donna's right chest cavity caused or substantially contributed to her death for two reasons:

{¶34} "* * * [O]ne, because the catheter was in the right chest, it prevented the resuscitation [replacement] fluid from going in the right place. So it didn't go into her circulation system. It went into her right chest. And the second is because it was in her right chest, it compromised whatever fluid she had in her circulation from being effectively pumped through her body."

{¶35} Dr. Wesley Alexander, defendant's own director of the transplant division, testified at trial as follows:

{¶36} "My opinion, that there was negligence in this case * * * the central line placement was done incorrectly, without adequate postoperative monitoring for interpretation of what had happened; and that because of that lack of follow-up interpretation, that the patient had an excessive amount of fluid placed in her chest, which caused cardiac compression and death."

{¶37} Defendant called three expert witnesses. Dr. Richard Stilz, a board-certified anesthesiologist, testified that in his opinion to a medical probability, Donna did not have hypovolemia at the time of her cardiac arrest or death and that the hydrothorax did not cause Donna's death. Even assuming that there were two liters of fluid in Donna's chest, Dr. Stilz opined that such an amount would not be enough to compress her heart, the superior vena cava, or the inferior vena cava. Dr. Stilz concluded that the most probable cause of Donna's cardiac arrest and death was pulmonary.

{¶38} Dr. James Molnar stated that he was board-certified in anesthesia, internal medicine, and pain management. Dr. Molnar opined that Hungerford did not pierce Donna's lung in the process of placing the central line. He further

opined that the hydrothorax did not cause or contribute to Donna's death, because, even assuming that two liters of fluid were in Donna's chest, the fluid did not cause any clinically identifiable compression of her heart or great vessels. Dr. Molnar also opined that Donna was not hypovolemic and that hypovolemia did not cause her death. Dr. Molnar concluded that Donna's death was caused by a pulmonary embolism, although he admitted that there was no pathological proof that Donna developed an embolism.

{¶39} Dr. Kenneth McCarty, Jr. testified that he was board-certified in both internal medicine and pathology with a Ph.D. in biochemistry, spending approximately eighty percent of his time in the active clinical practice of medicine. Based upon the clinical and pathological evidence he reviewed, Dr. McCarty opined that Donna died as a result of micro emboli to the lung. He stated that Donna was not hypovolemic prior to her cardiac arrest. Dr. McCarty further opined that the hydrothorax did not cause sufficient pressure in Donna's chest to compress her heart and major vessels.

{¶40} Testimony was presented by both sides during the trial regarding the existence of pulmonary emboli on the histologic slides that were taken during the autopsy of Donna. Dr. Handy testified that there was not a high concentration of micro emboli shown on the slides of Donna's lungs. Dr. Handy further testified at trial:

{¶41} "According to standard reference text, you would have to have 60 percent of the lung involved with thrombo emboli for there to be a significant clinical emergence. In other words, in order for it to become clinically manifest, for it to cause problems, it would have to involve 60 percent."

{¶42} Dr. McCarty testified that the lungs were not reasonably sampled during the autopsy, and that the clinical course of Donna indicates the sudden variation that occurred was consistent with pulmonary emboli.

{¶43} Based upon the totality of the evidence, and after carefully evaluating the credibility of all the witnesses, including the expert witnesses, the court concludes that plaintiffs have proven by a preponderance of the evidence that defendant breached its duty of care to Donna in allowing a resident to supervise a trainee nurse anesthetist in the placement of the CVL. The court further finds that defendant breached its duty of care to Donna when it failed to correct the CVL after becoming aware of its improper placement as shown on the x-ray taken at 3:30 p.m. The court further finds that the misplacement of the CVL and the lack of follow-up care by defendant proximately caused a hydrothorax to develop in Donna's chest cavity, and because the replacement fluid was not delivered to the circulatory system where it was intended, Donna developed hypovolemia. The court further finds that the hydrothorax caused pressure on the heart and major vessels, which, in combination with hypovolemia, led to

Donna's cardiac arrest and death. The court further finds that Donna was conscious at various times after her surgery and felt pain in her neck, back, and chest. Therefore, plaintiffs have proven their claims of medical malpractice and wrongful death by a preponderance of the evidence.

## Personal Injury of Smithers

{¶44} Smithers underwent a painful and serious surgery for the removal of his left kidney in order to save Donna's life. When Smithers signed the surgical consent form, he signed it under the condition that defendant would perform its duties in a non-negligent manner, and that defendant would at least follow its own minimum standards. The court finds that Smithers, in the unique position of being involved in Donna's surgery as an organ donor, has lost the use of his left kidney as a proximate result of defendant's negligence in its treatment of Donna. Therefore, Smithers is entitled to damages on his personal injury claim.

## Negligent Infliction of Emotional Distress

{¶45} Both Daniel and Smithers assert separate claims for negligent infliction of emotional distress. In order to recover for negligent infliction of emotional distress when no contemporaneous physical injury occurs, the emotional injuries sustained must be found to be both serious and reasonably foreseeable. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph three of the syllabus. The factors to be considered to determine whether a negligently inflicted emotional injury was reasonably foreseeable include "(1) whether the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away; (2) whether the shock resulted from a direct emotional impact upon the plaintiff from sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) whether the plaintiff and victim * * * were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." *Paugh v. Hanks,* at paragraph 3b of the syllabus. In *Paugh,* the court explained that these factors "are by no means exclusive, and the mere failure of a plaintiff to satisfy all of them should not preclude an aggrieved party from recovery." Id., 6 Ohio St.3d at 79, 6 OBR 114, 451 N.E.2d 759. The court also stated that "we believe that it is not necessary for a plaintiff to actually see the accident." Id. In addition, expert medical testimony may be helpful to the court in establishing whether the emotional injury is, in fact, serious; however, it is not required. See *Paugh* at 80, 6 OBR 114, 451 N.E.2d 759.

{¶46} The court notes that since the issues of liability and damages were bifurcated for trial, it sustained both parties' objections to questions regarding

the nature and extent of plaintiffs' emotional pain and suffering. Since the extent of serious emotional distress was not explored at the liability trial, plaintiffs' claims for negligent infliction of emotional distress shall be held in abeyance and the court will consider those claims at the trial on damages.

### Lack of Informed Consent

{¶47} Smithers also has asserted a claim for lack of informed consent. Prior to surgery, Smithers signed a consent form, acknowledging the risks of the surgical procedure to remove his left kidney. Smithers admitted that he was informed of the risks of his surgery. Smithers's surgery was successful and without complications. Therefore, the court finds that Smithers has failed to prove lack of informed consent regarding the medical treatment he received at defendant's hospital.

{¶48} Judgment shall be rendered in favor of plaintiffs on their claims for the wrongful death and personal injury of Donna, and for Smithers's claim of personal injury. Plaintiffs' claims for negligent infliction of emotional distress shall be addressed at the trial on the issue of damages.

### *JUDGMENT ENTRY*

{¶49} This case was tried to the court on the sole issue of liability. The court has considered the evidence, and for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiffs in an amount to be determined after the second phase of the trial dealing with the issue of damages. The court shall issue an entry in the near future scheduling a date for the trial on the issue of damages.

Judgment accordingly.

FRED J. SHOEMAKER, J., retired, of the Court of Common Pleas of Franklin County, sitting by assignment.

### *JUDGMENT ENTRY*

Filed Feb. 26, 2002

RUSSELL LEACH, Judge.

{¶50} On February 21, 2002, the court conducted a pretrial conference with the parties in the above-captioned case. At the conference, the parties stated that they had reached a settlement in this case. Therefore, the trial on the issue of damages scheduled for March 19–22, 2002, is VACATED. Plaintiffs' January 23, 2002 motion for extension of time to submit expert reports is OVERRULED

**60**

as moot. The parties shall file settlement papers within *sixty days* of the date of this entry.

RUSSELL LEACH, J., retired, of the Franklin County Municipal Court, sitting by assignment.